Joe **CONWAY,** Plaintiff-Appellant,

v.

James **WATT,** Secretary of the Interior of the United States of America, Edward W. Stuebing, Bruce R. Harris and Anne Poindexter Lewis, Defendants-Appellees.

No. 82–2025.

United States Court of Appeals, Tenth Circuit.

Sept. 21, 1983.

and gas drawing entry cards (DECs) with the Bureau of Land Management (BLM). Evidence produced by Conway, and not countered by the BLM, showed that Conway properly dated 146 of these DECs. Only one DEC, allegedly submitted at the same time as the other 146 DECs, was undated. This undated DEC was drawn with first priority for a lease parcel in Wyoming.

Conway's first-drawn DEC was signed and otherwise complete except for the omission of the date next to the signature box on the card. On the basis of this omission, the BLM rejected Conway's lease offer because it was not dated as required by 43 C.F.R. § 3112.2–1(c) (1980), which provided:

> . . . The application shall be dated at the time of signing. The date shall reflect that the application was signed within the filing period.

Conway timely appealed to the Interior Board of Land Appeals (IBLA). The IBLA affirmed the decision of the BLM. Joe Conway, 59 IBLA 314 (1981). Appeal was then had to the federal district court. That court affirmed the decision of the IBLA. Consequently, Conway has appealed to this court.

We are called upon to consider one issue, namely, whether the absence of a date renders this DEC *per se* defective.

R.R. Bostwick and Jo Sherman, Murane & Bostwick, Casper, Wyo., for plaintiff-appellant.

Carol E. Dinkins, Asst. Atty. Gen., Richard A. Stacy, U.S. Atty., Toshiro Suyematsu, Asst. U.S. Atty., Cheyenne, Wyo., and Robert L. Klarquist and Ellen J. Durkee, Attorneys, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before DOYLE, McKAY and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Circuit R. 10(e). The cause is therefore ordered submitted without oral argument.

This is an appeal from a district court decision on the necessity of dating simultaneous oil and gas drawing entry cards.

Under the provisions of 43 C.F.R. § 3112 (1978), Conway filed 147 simultaneous oil

 It is well settled that courts must accord great deference to administrative regulations. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). But a regulation would not be valid if shown to bear no reasonable relation to congressional intentions (as expressed in the Act at issue or in legislative history), or if shown to be otherwise arbitrary. *Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 69–70, 57 S.Ct. 364, 371, 81 L.Ed. 510 (1937); *Busey v. Deshler Hotel Co.,* 130 F.2d 187, 190 (6th Cir.1942). *See American Trucking Ass'ns. v. United States,* 344 U.S. 298, 314, 73 S.Ct. 307, 316, 97 L.Ed. 337 (1953); *Diefenthal v. C.A.B.,* 681 F.2d 1039, 1044 (5th Cir.1982), *cert. denied,* —— U.S.

——, 103 S.Ct. 732–33, 74 L.Ed.2d 956 (1983).

■ The purpose behind enactment of the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. (1976), was the development of western portions of the country, and for that matter development of the nation as a whole. Cong.Rec., February 10, 1920, at 2711 (remarks of Rep. Taylor). Regulations promulgated by the Department of the Interior should be consistent with this ultimate objective.

Conceivably, the Secretary of Interior's decision to hinge entitlement to a lease upon something so insubstantial as the presence or absence of a date on one DEC card "would have a deleterious effect upon the program as a whole. Private individuals would doubt the fairness of the program, and they might become wary of seeking to take advantage of it." Lowey v. Watt, 684 F.2d 957, 967 (D.C.Cir.1982).

Congress has already expressed concern about unfair administration of the leasing program in a related context, namely, the reinstatement of cancelled leases. The legislative history of a recent amendment to the Mineral Leasing Act provides significant commentary:

Prior to 1954, an oil and gas lease was not terminated automatically for failure to pay the full amount of rental timely. This resulted in situations where a lease could run for a year or more without payment of rental. Attempts by the Bureau of Land Management to collect back rentals were time consuming and frequently unsuccessful. A pattern seemed to evolve that if in the time between nonpayment and the time the next rental was due the lease suddenly became valuable the rental would be tendered promptly. If, however, during this time the lease appeared to be of little or no value, the rental would not be paid and the lessee would maintain that he had dropped the lease when he failed to make the rental payment . . . .

In 1954, the Congress enacted Public Law 83–555, which amended the Mineral Leasing Act of 1920 to provide for the automatic termination of a Federal oil and gas lease in those instances where the lessee failed to pay the full amount of the rental on time. The law provided no discretion to the Secretary of the Interior to reinstate a lease. An underpayment of a few cents or a delay of 1 day resulted in the automatic cancellation of the lease . . . .

Because Public Law 83–555 was harsh and inflexible, the Congress enacted Public Law 91–245 in 1970 to provide the Secretary with limited authority to reinstate an oil and gas lease. Under this law, the Secretary, at his discretion, could reinstate a lease if (1) the rental deficiency was nominal, and (2) the full amount of the rental due was tendered within 20 days of the due date. Thus, a grace period of 20 days was provided.

\* \* \* \* \* \*

For a variety of reasons, Public Law 91–245 is insufficient to cover all cases pertaining to late payment. Such payments are usually inadvertent mistakes. Sometimes, they are due solely to the fault of the lessee. In other cases, misinformation from the Federal Government, or a misunderstanding between the lessee and Federal employees are at fault.

Federal Oil and Gas Royalty Act of 1982, H.R.Rep. No. 97–859, 97th Cong., 2d Sess., reprinted in [1982] U.S.Code Cong. & Ad. News, 4268, 4274.

Accordingly, and in the words of the House Report on the somewhat ineffective 1970 amendments, the objective of Congress has been to "enable the Secretary to do equity." H.R.Rep. No. 91–1005, 91st Cong., 2d Sess., reprinted in [1970] U.S.Code Cong. & Ad.News, 3002.

■ Therefore, from the standpoint of termination of existing leases, it is the intention of Congress that lessees must not suffer hardship on account of their trivial, inadvertent errors. Although we are dealing in this case with a slightly different area, we nonetheless are interpreting congressional intentions as to the same program. In light of the foregoing, it is doubt-

ful that Congress would condone the Secretary's decision not to award a lease simply because of Conway's inadvertent omission of the one date in a group of 147.

The Secretary has chosen to downplay the paramount congressional intention to promote western development and has focused, instead, on Congress' requirement that leases only be awarded to "qualified" applicants. 30 U.S.C. § 226(c). The applicant is required, by the language of the Mineral Leasing Act, by the Secretary's regulations, and by language on the DEC application, to certify under penalty of the criminal sanctions of 18 U.S.C. § 1001 that he is a qualified applicant. He must be a United States citizen, 30 U.S.C. § 181; he must not be a minor, 43 C.F.R. § 3102.1(c) (1980); he must disclose the identity of all other persons and entities with an interest in the potential lease and the nature of their interest, 43 C.F.R. § 3102.2–7 (1980); and he may not make multiple filings. 43 C.F.R. § 3112.6–1(c) (1980). The Secretary argues that since the truth of these representations can change over time, only a representation which is dated can have any meaning. The Secretary also asserts that criminal prosecution for the making of a fraudulent statement would be rendered more difficult if it were optional for an applicant to date his DEC.

These assertions simply do not hold water. *First*, Conway's DEC was not invalidated on grounds of changed circumstances or fraud. It was invalidated merely because it was undated. Therefore, the Secretary's concerns as to fraud and applicant qualifications have no relevance here. The Secretary would have a much stronger case if there were some evidence of fraud or other disqualification. But the only substantive evidence introduced in this matter was offered by Conway. That evidence showed that Conway made the petty error of failing to date one DEC out of 147 DECs he submitted to the BLM. Given this uncontroverted evidence, it is indeed difficult to discern an intent to defraud on the part of Conway. Since fraud and applicant qualifications are precisely what the Secretary is concerned about, he should be satisfied with Conway's DEC.

Conway's position in this case is quite similar to that of the plaintiffs in *Thompson v. Consolidated Gas Utilities Corp., supra*. The plaintiffs in *Thompson* challenged the validity of a gas proration order issued by the Railroad Commission of Texas. That order limited the production of gas from the plaintiffs' wells "to an amount below their market requirements under existing contracts, below their present production, and below the capacity of their transportation and marking facilities." *Thompson, supra*, 300 U.S. at 58, 57 S.Ct. at 365. The defendants in *Thompson* asserted that the order assailed by the plaintiffs was a regulation duly promulgated for the prevention of waste, and that, therefore, it should be upheld.

There was, however, no evidence of waste by the *Thompson* plaintiffs, although this was the very thing that the contested regulation was aimed at preventing. The lower court in *Thompson* found that " '[n]o evidence was offered—indeed, it was not even seriously claimed—that anything [plaintiff] had done or contemplated doing has, in the slightest degree, contributed or will contribute to waste.' " 300 U.S. at 70, 57 S.Ct. at 371.

In passing upon the validity of the regulation, the *Thompson* court assumed, for purposes of argument, that the Railroad Commission had every right to promulgate regulations to prevent waste. Nonetheless, the court concluded that the plaintiffs had sustained the heavy burden of showing that the regulation was arbitrary as applied to them. There simply was no evidence that the plaintiffs had threatened to waste resources in contravention of the regulation. 300 U.S. at 70, 57 S.Ct. at 371.

■ Surely, the Thompson Court's conclusion is applicable here. There was not the slightest evidence suggesting that Conway was an unqualified applicant or that he had committed a fraud on the BLM. The date regulation was palpably arbitrary as applied to Conway.

There is yet a second reason why the Secretary's position is unfounded. The overwhelming weight of judicial authority belies the Secretary's assertion that a date is essential to his task of assessing the qualifications of lease applicants. The courts, on the few occasions they have addressed the question, have typically held that absence of a date is a trivial defect and that a date is not an essential term. *See Ahrens v. Andrus,* 690 F.2d 805, 808 (10th Cir.1982) (dicta) ("[a] signature date requirement serves no important purpose, the only material date is the one on which the DEC itself is filed with the Department"); *United States v. Klaia,* 127 F.2d 529, 530 (2d Cir.1942) (per curiam) (fact that date was inadvertently omitted from copy of search warrant was so trivial an error that no prejudice to defendant could have resulted); *Pellerin Laundry Machinery Sales Co. v. Hogue,* 219 F.Supp. 629, 639 (W.D.Ark.1963) (undated promissory note was valid and negotiable). *But see Sorensen v. Andrus,* 456 F.Supp. 499 (D.Wyo.1978). In *Skaggs v. Fyffe,* 266 Ky. 337, 98 S.W.2d 884–889 (1936), the Kentucky Court of Appeals held that the failure of persons to date their signatures on an election petition, even though *required* by statute, was not fatal:

> [T]he provisions of the statute that the post office address and date of signature shall be stated are interpreted as being directory, although their qualification as voters of the territory involved is, of course, mandatory because jurisdictional. The provision ought to be observed in the interest of orderly procedure and to enable the county judge or any interested person to identify the petitioners conveniently.

■ Accordingly, it cannot be said that the Secretary's date regulation materially advances Congress' intention that lease applicants be "qualified."

Finally, although offers to lease must strictly comply with the Secretary's regulations, this court has consistently intimated that non-substantive errors are inappropriate grounds for finding DEC applications defective. *Ahrens v. Andrus, supra,* at 808;

*Winkler v. Andrus,* 594 F.2d 775, 777–78 (10th Cir.1979). This is in accord with the principle *de minimis non curat lex,* the law does not concern itself about trifles. *See Bates v. Provident Consumer Discount Co.,* 493 F.Supp. 605, 607–08 (E.D.Pa.1979), aff'd, 631 F.2d 725 (3rd Cir.1980) (although provisions of Truth in Lending Act are to be strictly construed, lender should not be held liable for *de minimis* error of placing a $7.50 charge on wrong line of lending form); *Palmer v. United States Civil Service Comm'n,* 191 F.Supp. 495, 537 (S.D.Ill. 1961) (whereas " '[t]he court is not bound to a strictness at once harsh and pedantic in the application of statutes,' " the Civil Service Commission erred in finding violation of Hatch Act where political activities of Illinois Director of Conservation were *de minimis* ). Conceivably a situation could exist in which a date is of the essence. Needless to say this is not such a case.

■ Inasmuch as the great weight of judicial authority places little or no emphasis on the absence of a date, Conway's failure to date his DEC would indeed appear to be a *de minimis,* a non-substantive error.

The Secretary has raised two additional rationales in support of the Interior Department's practice of insisting on strict compliance with its regulations. First, according to the Secretary, strict enforcement of the requirement of properly completed DECs is made necessary by the magnitude of the leasing program. Oil and gas lease drawings, it is said, attract thousands of offers each month and over two million each year. *Brick v. Andrus,* 628 F.2d 213, 215 n. 6 (D.C.Cir.1980). Presumably, therefore, the BLM cannot trouble itself with ascertaining the qualifications of millions of applicants.

This argument is fallacious for the simple reason that, no matter how many DECs are received, only three are drawn. 43 C.F.R. § 3112.3–1(a) (1980). Hence, the BLM need only verify the qualifications of, at most, three applicants per lease parcel. This is not an onerous task, particularly when the only defect in a DEC is the absence of a date.

A second argument proffered by the Secretary is that strict enforcement preserves the integrity of the leasing program by eliminating any discretion on the part of BLM employees to decide which improperly completed DECs will be accepted, thereby limiting the possibility of fraud and collusion.

This argument, that BLM employees must act as automatons in reading DECs, is severely undercut by 43 C.F.R. § 3102.3 (1980). The section provides that BLM staffers may request applicants to submit additional information to the BLM to demonstrate their qualifications. Section 3102.3 bestows broad discretion upon BLM employees. As the BLM stated in the Federal Register, "wide discretion is needed in order to insure compliance with the regulations and the statute." 45 Fed.Reg. 35156, 35158 (May 23, 1980). Surely, the BLM cannot have it both ways. The amount of collusion potentially forestalled by strict reading of DECs is no greater than the collusion which might be occasioned by BLM staffers who abuse their discretion under Section 3102.3. In any event, this drawing program is not to be a search for the slightest error so as to eliminate the first contestant and resurrect the second.

In light of the foregoing, we hold that, although the Secretary can require a signature date, he cannot make its absence a *per se* disqualification. When a date inadvertently is omitted and if the Secretary is concerned that that omission is fraudulent, he may require an applicant to produce proof that his or her signature was made on a qualifying date and that all other qualifications were satisfied as of that date. Such subsequent verification of qualifying status provides an adequate basis for the Secretary to proceed against an applicant on the basis of fraud. The Secretary's contrary view lacks a rational basis in the law. *See Hurley v. United States,* 575 F.2d 792, 798 (10th Cir.1978).

The district court's grant of summary judgment must therefore be and it is hereby reversed.